ANGELA PIERCE,

        Plaintiff,

v.                                          Case No. 21-C-354

CALUMET COUNTY, BRETT J. BOWE,
JULIE HOERNING, BRIAN POST,
JOSEPH TENOR, JORDAN FICKEL,
and DR. MANUEL MENDOZA,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

      Angela Pierce, as a pretrial detainee at the Calumet County Jail, was subjected to a body cavity search by a doctor at a local hospital at the request of jail officials who suspected she might have contraband hidden in her pelvic region. Pierce filed this action pursuant to 42 U.S.C. § 1983 against the jail officials who authorized the search, the officers who escorted her to the hospital, and the doctor who performed the examination, alleging that they violated her constitutional rights when they ordered, facilitated, and subjected her to a warrantless body-cavity search. Pierce alleges that Defendants violated her Fourth Amendment rights to be free from unreasonable searches and seizures, conspired to deprive her of her Fourth Amendment rights, and failed to intervene to prevent the violation of her Fourth Amendment rights. She seeks compensatory and punitive damages under § 1983; attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and indemnification for the liability of its employees from Calumet County pursuant to Wis. Stat. § 895.46. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Before the

1

court are Defendants' motions for summary judgment. For the following reasons, both motions will be granted.

## BACKGROUND

On March 21, 2019, after becoming aware of outstanding warrants for her arrest, Pierce turned herself in to the Calumet County Jail (CCJ). Pl.'s Statement of Fact (PSOF), Dkt. No. 48, ¶ 76. Because the Calumet County Jail did not have space for her, Pierce was transferred to the Winnebago County Jail (WCJ) on March 22, 2019. *Id.* ¶ 77. As part of its routine booking process at its jail, Winnebago County requires each incoming inmate to undergo an electronic body scan in order to prevent inmates from smuggling into the jail contraband, such as weapons or drugs that could pose a threat to the safety and security of the facility, staff, or inmates. County Defs.' Proposed Findings of Fact (CDPFOF), Dkt. No. 58, ¶¶ 14–15. WCJ staff are trained to look for "shadows" on body scans of inmates in their abdominal and pelvic regions as indications of the presence of contraband. *Id.* ¶¶ 17–18.

WCJ staff who viewed the image from Pierce's body scan determined that a shadow appeared in her pelvic region, suggesting the possible presence of contraband. *Id.* ¶¶ 23–24. Several hours later, WCJ staff performed a second scan on Pierce and determined that the shadow was still present in her pelvic region. *Id.* ¶¶ 27–28. WCJ staff requested a further review of the two body scans by the WCJ nurse, who confirmed that the scans strongly suggested the presence of some kind of foreign object in Pierce's pelvic region. *Id.* ¶¶ 30–31.

Because the body scans indicated the presence of contraband, WCJ officials refused to accept Pierce. *Id.* ¶ 33. WCJ officials notified CCJ of its findings and its decision not to accept Pierce. *Id.* ¶ 42. Pierce was transported back to the CCJ that evening by CCJ Sergeant Julie Hoerning. *Id.* ¶¶ 50–51.

2

Based on what WCJ officials had told her, Sergeant Hoerning believed there was reasonable suspicion to justify a body cavity search of Pierce. *Id.* ¶ 64. Rather than make the decision herself, however, Sergeant Hoerning contacted Calumet County Chief Deputy Brett Bowe on the morning of March 23, 2019, and informed him that Pierce had been rejected by WCJ because of the shadow that showed up on her body scan. *Id.* ¶¶ 65–67. Sergeant Hoerning told Chief Deputy Bowe that she was worried that if something was inside Pierce's body, it could cause a medical issue for Pierce, and she was concerned for Pierce's health and well-being. *Id.* ¶ 71. For this reason, Sergeant Hoerning told Chief Deputy Bowe that she believed a cavity search was necessary for Pierce's safety, and Bowe agreed. *Id.* ¶¶ 72–73. Upon authorizing the search, Sergeant Hoerning notified CCJ Correctional Officer Brian Post that Pierce would be taken to the hospital for a cavity search. *Id.* ¶ 79. Deputies Joseph Tenor and Jordan Fickel were dispatched to transport Pierce to Ascension Calumet Hospital. *Id.* ¶¶ 83–86. Officer Post escorted Pierce from her cell to the booking room where Deputies Tenor and Fickel were waiting. *Id.* ¶ 83.

Upon her arrival, Pierce was placed in an examination room where a history was taken by a nurse. Mendoza Proposed Findings of Fact (MPFOF), Dkt. No. 49, ¶¶ 10–11. Although Pierce denies providing such a history, the nurse's notes indicate that Pierce stated that while she was at WCJ, they did "some type of 'body scan'" and a foreign body was found; she was then returned to jail and was "here for exam." Dkt. No. 51-8 at 1. The notes further state that Pierce complained of moderate pain in her vagina. *Id.* Pierce was then seen by Dr. Manuel Mendoza, a physician employed by Remedy Medical Services, S.C., which provided medical staff for the hospital's Emergency Department. MPFOF ¶¶ 1–5, 17. Dr. Mendoza was advised by the nurse that Pierce was brought to the Emergency Department because of a possible foreign body inside of her. *Id.* ¶ 14. Dr. Mendoza proceeded to examine Pierce's vaginal and a rectal cavities. Dr. Mendoza did

3

not detect a foreign body in Pierce's vagina, rectum, or pelvis. PSOF ¶ 58. After finding nothing in the examination, Dr. Mendoza ordered an abdominal X-ray. *Id.* ¶ 55. The radiology report concluded that there was no foreign body in Pierce's abdomen. *Id.* ¶ 57.

After his interaction with Pierce was complete, Dr. Mendoza completed a CCJ form entitled "Medical Clearance Form." *Id.* ¶ 41. The form indicated that Dr. Mendoza had seen Pierce for a "suspected vaginal foreign body," that her physical exam was "unremarkable," and that he did not locate a foreign body. Dkt. No. 51-9. Dr. Mendoza checked the box on the form that stated "I have examined the prisoner and find him/her acceptable for admission to the jail. I have outlined below or included a suggested treatment plan for the prisoner's condition." *Id.* Pierce was then returned to the jail. PSOF ¶ 18.

In her complaint, Pierce claims that Dr. Mendoza and the Calumet County officers, including Chief Deputy Bowe, Sergeant Hoerning, Deputies Tenor and Fickel, and Correctional Officer Post, conspired to violate her Fourth Amendment rights by agreeing to subject her to an unreasonable and unnecessary body cavity search which was performed in an unreasonable manner. She further claims that the County Defendants violated her Fourth Amendment rights by directing, approving, acquiescing, supervising, and/or allowing her to be subjected to such a search, and that Dr. Mendoza violated her rights by conducting such a search. All of the defendants are further alleged to have failed to intervene to prevent the alleged violation of Pierce's rights. Finally, Pierce seeks payment of any damages caused by the County Defendants pursuant to state law mandating County indemnification of its employees for liability incurred in carrying out their duties.

4

## LEGAL STANDARD

Summary judgment shall be granted when the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences from it in the light most favorable to the nonmoving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Although Pierce has asserted five separate claims against seven defendants, all of her claims rise or fall on a single question: Was the body cavity search conducted by Dr. Mendoza lawful? That is, was the search legally justified and conducted in a reasonable manner? This question is determinative because it is not unlawful to direct, approve, acquiesce in, supervise, or allow a lawful act. Nor can one be held liable for failing to intervene to prevent, or for conspiracy to commit, a lawful act. *See House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992) ("A person may not be prosecuted for conspiring to commit an act that he may perform with impunity."); *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("Simply put, there was no constitutionally

5

impermissible failure to intervene because there was no violation that compelled intervention."). And, of course, the County has no duty to indemnify its employees for lawful acts that do not incur personal liability.

The answer to the question presented by this case is governed by the Seventh Circuit's decision in *Brown v. Polk County*, 965 F.3d 534 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1304 (2021). In *Brown*, the court held that jail officials could lawfully conduct a physically penetrative cavity search of a pretrial detainee as long as there was reasonable suspicion to believe that she was hiding contraband inside her body. In that case, an inmate named Jacquiline Duke told a correctional officer that Brown was hiding a large amount of methamphetamine in a body cavity. The correctional officer relayed the report to Donna Johnson, the jail nurse, who was more familiar with Duke. Based on her prior dealings with Duke, Nurse Johnson did not trust the report, so she checked with Amy Nelson, another inmate she thought more trustworthy. Nelson corroborated Duke's accusation, stating that Brown had told other inmates that she was hiding between a quarter gram and an "eight ball" of methamphetamine in her body. *Id.* at 536. Nelson further stated that the drugs were not sealed properly, and so Brown had been looking for somewhere else to hide them. Nelson reported that she had seen Brown use the bathroom multiple times and that other inmates were worried. Nurse Johnson then discussed the information she had obtained with a corrections officer and other staff who concluded the evidence was sufficient to justify a body cavity search. *Id.* The corrections officer passed on the recommendation to the jail administrator, who then authorized the search pursuant to the county's policy, and Brown was taken to a local hospital where a doctor and nurse performed the search. No contraband was found. *Id.* at 537.

Claiming the search was unlawful, Brown sued the county and the jail officials who had authorized the search. The district court granted summary judgment in favor of the county

6

Case 2:21-cv-00354-WCG   Filed 11/08/22   Page 6 of 10   Document 66

defendants, and the Court of Appeals affirmed. Noting that invasive searches, which included visual inspections of body openings, even without reasonable suspicion, had been upheld after contact visits in prison or during the intake process for pretrial detainees, the court concluded that more was needed to justify a physically intrusive body cavity search. *Id.* at 538–39 (citing *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979); *Florence v. Bd. of Chosen Freeholders of Burlington*, 566 U.S. 318, 324, 339 (2012)). But the court stopped short of requiring probable cause and a warrant. "In these circumstances," the court held, "the search must be supported by reasonable suspicion." *Id.* at 539. Acknowledging the magnitude of the invasion of personal privacy, the court nevertheless explained why reasonable suspicion was sufficient:

> Brown correctly observes that the search she underwent was more invasive because it was not just visual but also involved a physical intrusion into the most private parts of her body. No doubt she is right on that score. But given the heft of the security interest at stake, the invasion to her privacy was not so much greater that it pushes the threshold suspicion requirement into probable cause. The Fourth Amendment required Polk County jail officials to have only reasonable suspicion that she had concealed contraband inside her body before moving forward with the search.

*Id.* at 540.

The court in *Brown* then concluded that the jail officials did in fact have a reasonable suspicion that the inmate had contraband concealed in her body. The jail officials "relied on tips from both inmates Duke and Nelson," the court noted, "and a credible tip from a reliable informant can support reasonable suspicion." *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 146–47 (1972)). The court found that "Nelson's information in particular bore several signs of reliability." *Id.* She was considered a credible witness and her account was detailed, based on firsthand observations, and recounted recent events." *Id.* And because the chief deputy had authorized the search in reliance on the correction officer's representation that the evidence was sufficient to support a search under the county's policy, the court concluded that the collective-knowledge doctrine

7

imputed knowledge of the reported information to him. This was sufficient to establish reasonable suspicion. *Id.*

The same conclusion follows here. Sergeant Hoerning was told by the WCJ staff that Pierce could not be accepted into the jail population because it appeared from the electronic body scan WCJ had conducted that she had a foreign body in her pelvic region. Of course, Sergeant Hoerning was unaware of the technical details of WCJ's scanning equipment. But neither she nor any other CCJ official had any reason to suspect that WCJ staff were trying to mislead them or that they were in error. Body scans were apparently a routine part of the WCJ booking process relied upon by WCJ staff in the determination of whether to accept an inmate into the jail. Information of this nature is sufficient to establish reasonable suspicion that an inmate is concealing something inside her body. Unlike tips provided by a couple of inmates, an electronic scanning device operated by the staff of another detention facility is likely to be more objective and not subject to the pressures and incentives that can lead to false accusations in a prison setting. Although CCJ staff were apparently unaware of it, the evidence shows that WCJ staff conducted two scans of Pierce and had the jail nurse review the scans as well. The WCJ nurse confirmed that the scans strongly suggested the presence of some kind of foreign object in Pierce's pelvic region. CDPFOF ¶ 31. While Pierce claims that she was told by an unknown WCJ staff member that the fact that the shadow they observed on the scan did not move suggested it was not contraband, she offers no admissible evidence to support her claim. Given this evidence, the decision to order a body cavity search was lawful. And since the CCJ officials had lawful authority to conduct such a search, Dr. Mendoza, who was asked to conduct the search or examination at their request and under their authority, was likewise entitled to do so.

Of course, as the court also noted in *Brown*, an invasive search of this nature, even where justified, must be conducted reasonably in terms of its scope, the manner in which it is conducted, and where it is conducted. 965 F.3d at 540. Here, the search was conducted at a hospital by a licensed physician, who viewed his task as more akin to a medical examination than a search for evidence. According to the medical records, Pierce remained at the hospital for more than two hours, Dkt. No. 51-1 at 1, but the actual exam took approximately 30 minutes and included taking cervical swabs to test for other conditions. *Id.*; MPFOF ¶¶ 17–20. After he completed his exam, Dr. Mendoza ordered an abdominal series X-ray of Pierce "in order to be comprehensive and complete an evaluation." Mendoza Dep., Dkt. No. 45-3 at 64:17–65:09. According to Pierce, Dr. Mendoza was "very jovial," "nice," and "upbeat." Pierce Dep., Dkt. No. 45-2, at 128:24–129:04. Although she could not recall specifically what he said to her, Pierce testified that "his mood seemed uplifting" and she remembered feeling that "he was friendly." *Id.* at 130:15–131:01. By her own admission, Pierce never told Dr. Mendoza that she did not want him to perform the examination/search. *Id.* at 133:05–12. Indeed, Dr. Mendoza states that he believed he was performing a medical procedure to address a problem Pierce was experiencing, not undertaking a search on behalf of the jail officials. *See* Mendoza Dep., Dkt. No. 45-3 at 91:12–92:22. There is no evidence that Dr. Mendoza conducted his examination in an abusive or otherwise improper manner.

The parties have two disputes concerning the facts surrounding the search. They dispute whether Pierce was handcuffed during the examination. Deputy Fickel, who was on his second day on the road as a sheriff's deputy, admits that he initially handcuffed one of Pierce's wrists to the rail of the examination table when they first arrived at the hospital. CDPFOF ¶¶ 84, 87–88. Fickel removed the handcuff less than ten seconds later when Deputy Tenor instructed him that

9

they do not handcuff inmates to hospital beds. *Id.* ¶¶ 88–90. Pierce, on the other hand, claims she remained handcuffed to the rail throughout the time she was in the exam room, including when she got dressed after the search. Pl. Resp. to CDPFOF, Dkt. No. 62, ¶ 90.

There is also a factual dispute over whether Deputies Fickel and Tenor could see Pierce during the examination/search. The parties agree that there was a privacy curtain around the examination table where Dr. Mendoza conducted his examination. Pierce contends, however, that there were gaps in the curtain through which she could see Fickel and Tenor and infers that they could see her. *Id.* ¶ 91. However, Fickel and Tenor both state that they "never saw, observed, or attempted to look at any part of [Pierce's] naked body on March 23, 2019." CDPFOF ¶¶ 102–103. Notably, Pierce does not claim that either Fickel or Tenor did watch the examination/search Dr. Mendoza performed on her, only that they could have done so.

Even viewing these disputes in the light most favorable to Pierce, this evidence is not enough to support a finding that the search was conducted in an unconstitutional manner. There is no evidence to suggest that either officer, or any of the defendants, mistreated Pierce or took advantage of her. The search was justified under the existing law, and it was conducted in a reasonable manner. It thus follows that Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, both Dr. Mendoza's motion for summary judgment (Dkt. No. 42) and the County Defendants' motion for summary judgment (Dkt. No. 54) are **GRANTED**, and Pierce's claims against Defendants are dismissed with prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of November, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
